IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

REGIONAL EMPLOYERS' ASSURANCE       :          CIVIL ACTION
LEAGUES VOLUNTARY EMPLOYEES'        :
BENEFICIARY ASSOCIATION TRUST       :
                                    :
           v.                       :
                                    :
GRETCHEN HUTTO CASTELLANO           :
                                    :
           v.                       :
                                    :
REGIONAL EMPLOYERS' ASSURANCE       :
LEAGUES VOLUNTARY EMPLOYEES'        :
BENEFICIARY ASSOCIATION TRUST,      :
BY PENN-MONT BENEFIT SERVICES,      :
INC., PLAN ADMINISTRATOR, et al.    :          No. 03-6903


MEMORANDUM

McLaughlin, J.                               August 24, 2015

        This case arises out of a decision made by the

Regional Employers' Assurance League Voluntary Employees'

Beneficiary Association (the "REAL VEBA") Trust, through its

Plan administrator, Penn-Mont Benefit Services, Inc. ("Penn-

Mont"), to deny benefits to Gretchen Hutto Castellano

("Castellano" or "Mrs. Castellano").  Before a final

determination of the benefits due to Mrs. Castellano was made,

REAL VEBA brought a declaratory judgment action against

Castellano, who then asserted counterclaims against REAL VEBA

fand other related defendants.  Both sides have moved for
summary judgment.[1]

The Court will deny the plaintiff REAL VEBA's and
grant the defendant Castellano's motion for summary judgment on
the declaratory judgment action.  The Court will grant
counterclaimant Castellano's motion for summary judgment with
respect to her claim under Section 502(a)(1)(B) of the
Employment Retirement Income Security Act of 1974 ("ERISA"),
29 U.S.C. § 1001 et seq., and deny counterclaimant Castellano's
motion for summary judgment with respect to her Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.
§ 1961 et seq., and common law claims.


I.   Summary Judgment Standard

Summary judgment is appropriate if there is "no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  The moving party bears the initial burden of informing
the court of the basis for its motion.  Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).  Once a properly supported

---

[1] The plaintiff's motion for summary judgment is Docket No.
127.  The defendant/counterclaim plaintiff Castellano filed a
motion for summary judgment (Docket No. 125) and then a
supplemental motion for summary judgment (Docket No. 249) after
the Court reopened discovery in the related Perez v. Koresko,
09-cv-988, case.

motion is made, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A fact is "material" if it might affect the outcome of the suit under the governing law.  Id. at 248.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  The Court considers properly supported facts genuinely disputed only when the party opposing the fact provides citations to the record.

II.  Factual Background[2]

A.   The Parties

Plaintiff REAL VEBA Trust, by its Plan administrator, Penn-Mont, brought a declaratory judgment suit against Mrs. Castellano and Domenic M. Castellano, D.D.S., P.A. (the "Dental Practice") in late 2003.  The Dental Practice settled and is no longer a party in this case (Docket No. 58).

Mrs. Castellano is the widow of Dr. Domenic Castellano, who owned and managed the Dental Practice prior to

---

[2] This section will refer frequently to the following documents: Koresko Stmt. (Docket No. 128); Castellano Stmt. Resp. (Docket No. 134); Castellano Stmt. (Docket No. 249); Koresko Stmt. Resp. (Docket No. 264).  Castellano exhibits will be denoted "CX" and Koresko exhibits will be denoted "KX."

his death.[3]  Mrs. Castellano has brought various ERISA, RICO, and state law counterclaims against the plaintiff as well as against a host of Koresko-affiliated entities (collectively the "Koresko entities").  The counterclaim defendants are: the REAL VEBA Trust; Penn-Mont; Koresko & Associates, P.C.; Koresko Financial L.P.; John J. Koresko, V ("John Koresko" or "Mr. Koresko"); Jeanne D. Bonney; and Lawrence Koresko.  See Castellano Stmt. ¶¶ 2-4; Reply to Interrogatories ¶ 17 (KX14); Counterclaim (Docket No. 27).

The Regional Employers' Assurance League ("REAL" or the "League") is an unincorporated association of employers. Employers belonging to the REAL may adopt a benefit structure for their employees under REAL's welfare benefit plan, whose assets are held in trust.  Penn-Mont is the Plan administrator for the REAL VEBA Plan.  Koresko Stmt. ¶ 2; Castellano Stmt. Resp. ¶ 2; Castellano Stmt. ¶ 2.

John Koresko, a lawyer and public accountant, is the author of the Plan and Trust documents for the REAL VEBA.  See generally Perez v. Koresko, No. 09-cv-988, 2015 WL 505471 (E.D. Pa. Feb. 6, 2015) judgment entered, No. 09-cv-988, 2015 WL 1182846 (E.D. Pa. Mar. 13, 2015) amended, No. 09—cv-988, 2015 WL

---

[3] The plaintiff claims that the fact that Mrs. Castellano is the widow of Dr. Castellano is a "conclusion of law," but cites nothing in the record to dispute that fact.  Koresko Stmt. Resp. ¶ 4.  The Court, therefore, accepts the fact as true.

2236692 (E.D. Pa. May 13, 2015).  He is also the sole
shareholder of his law firm, Koresko & Associates, P.C.
(subsequently renamed Koresko Law Firm, P.C.), which performs
functions on behalf of Penn-Mont and the REAL VEBA.  Id.  Penn-
Mont, a Pennsylvania corporation formed by Mr. Koresko, is a
corporate affiliate of Koresko & Associates, P.C., and has no
employees of its own.  Id.  Ms. Jeanne Bonney, an attorney, was
an employee of Koresko & Associates, P.C. (and then its
successor) and also represented Penn-Mont as counsel.  Id.; see
5/4/04 Koresko Aff. ¶¶ 1, 3, 13-16 (CX21); Castellano Stmt.
¶¶ 21-23, 26; Koresko Stmt. Resp. ¶¶ 21-23, 26.[4]


     B.   <u>Dr. Castellano's Association with the REAL</u>

        Thomas Morris served as a financial advisor to Dr.
Castellano in 1998 and was the broker who secured life insurance

---

[4] In the related case of <u>Perez v. Koresko</u>, brought by the
Secretary of Labor against Koresko, Koresko related entities,
and Jeanne Bonney, the Court found, after a bench trial, that
the defendants had violated ERISA in a variety of ways in
connection with their involvement in the Single Employer Welfare
Benefit Plan Trust ("SEWBPT"), the REAL VEBA Trust, and the
constituent employer-level employee benefit plans of the SEWBPT
and the REAL VEBA Trust.  The Court removed the defendants from
any position with regard to the SEWBPT, the REAL VEBA Trust, or
any of the Plans and permanently enjoined them from further
service in any capacity with the Trusts.  Id.

The Court has appointed a new administrator and Trustee for
the Trusts and has appointed a forensic accountant to conduct an
equitable accounting of the assets of the Trusts, with a sub-
accounting by Plan of each plan's interest in the Trusts.

coverage for the Dental Practice through the REAL VEBA.  Mr. Morris was asked by John Koresko's brother, Lawrence Koresko, to market the REAL VEBA to his clients as a vehicle for a tax advantaged purchase of life insurance.  Aff. of Thomas Morris (CX4).

On or about July 10, 1998, Dr. Castellano executed three documents: (1) an Adoption Agreement on behalf of the Dental Practice, which specified that the Dental Practice agrees to and adopts the REAL VEBA Plan and Trust; (2) an Employee Participation Agreement and Limited Power of Attorney on his own behalf[5]; and (3) a beneficiary nomination form on his own behalf. Koresko Stmt. ¶¶ 14, 23, 24; Castellano Stmt. Resp. ¶ 14, 23, 24.

The Adoption Agreement reflects the Dental Practice's agreement to become a member of the REAL and adopt the REAL VEBA Plan and its companion Trust.  Among other provisions, the agreement incorporates the REAL VEBA Trust agreement.  Adoption Agreement (CX5).

Under the Employee Participation Agreement and Limited Power of Attorney that he signed on his own behalf, Dr. Castellano agreed to participate in the Dental Practice's welfare benefit plan adopted under the REAL VEBA.  By signing

---

[5] Each employee who participates in her employer's plan must sign an Employee Participation Agreement and Limited Power of Attorney.  Castellano Stmt. ¶ 46; Koresko Stmt. Resp. ¶ 46.

the form, Dr. Castellano also appointed Penn-Mont and John
Koresko, or their authorized agent, employee, or delegate, to
serve as "Limited Attorney in Fact with respect to all matters
connected with and/or related to the procurement and maintenance
of benefits payable to [Dr. Castellano]."  The form also
indicates Dr. Castellano's agreement to release the REAL VEBA
Trustee, Penn-Mont, John Koresko, and their agents and employees
from "any liability which may result from any action taken in
reliance on or in connection with this document and the powers
granted hereunder."  Employee Participation Agreement (CX8).

     The beneficiary nomination form signed by Dr.
Castellano in 1998 specified that Gretchen Hutto Castellano was
to receive $150,000.00 of the $750,000.00 life insurance benefit
and that Dr. Castellano's three sons would each receive
$200,000.00.  The nomination form is directed to the Trustee of
the "Domenic M. Castellano, D.D.S., P.A. Voluntary Employees'
Beneficiary Association" under the REAL Trust.  1998 Beneficiary
Nomination Form (CX47).

     In connection with the Dental Practice's association
with the REAL VEBA, the Dental Practice received a Summary Plan
Description ("SPD") for the "Domenic M. Castellano, D.D.S. P.A.
Voluntary Employees' Beneficiary Association Health and Welfare
Benefit Plan Under the Regional Employer's Assurance Leagues
Trust."  The SPD informs employees that the Dental Practice "has

7

adopted a benefits program which provides you and your family valuable financial protection against the possibility of your death." Castellano Stmt. ¶¶ 8(b); Koresko Stmt. Resp. ¶¶ 8(b); SPD (CX6).

Dr. Castellano sent contributions on behalf of the Dental Practice to the REAL VEBA Trust so that qualified participating employees of the Dental Practice might receive benefits from the Trust. A portion of these contributions were used to purchase a life insurance policy on Dr. Castellano's life and on the lives of other participating employees.[6] Castellano Stmt. ¶ 11; Koresko Stmt. Resp. ¶ 11 (admitting that the Dental Practice made contributions to the Trust); Jefferson Pilot Policy (CX10); Ltr. from Jeanne Bonney (CX14) (acknowledging receipt of an $80,500.00 check for contributions as well as $2,890.00 in administrative fees).

The life insurance policy on Dr. Castellano's life was a flexible premium adjustable life insurance policy for $750,000.00. The beneficiary named on the policy is "as stated in application attached unless later changed." Jefferson Pilot Policy 3 (CX10). Mrs. Castellano does not dispute that the

---

[6] Mr. Koresko disputes the fact that the contributions were used to purchase a life insurance policy on Dr. Castellano's life, but cites no facts in the record to the contrary. Koresko Stmt. Resp. ¶ 12. Koresko's own statement of facts states that the Trustee purchases life insurance policies on the lives of participating employees to reinsure the REAL VEBA's promise to pay benefits. Koresko Stmt. ¶ 4.

8

Trustee of the REAL VEBA Trust was named as the beneficiary of
Dr. Castellano's life insurance policy.  Cf. Castellano Stmt.
¶ 14 (noting that the insurance policy was paid into the REAL
VEBA Trust); Plan Document § 7.05(a) (CX7) ("The policy shall be
a contract between the Trustee and the Insurer and shall reserve
to the Trustee all rights, options, and Benefits provided by the
Policy and permitted by the Insurer ... .").


> C.    Dr. Castellano's Death, Castellano's Claim for
>       Benefits, and the Proposed Settlement Agreements

Dr. Castellano died on June 17, 2003.  On or about
July 7, 2003, Mr. Morris, Dr. Castellano's insurance agent,
notified Penn-Mont by letter of Dr. Castellano's death.
Subsequently, the REAL VEBA Trust received a letter and check in
the amount of $751,266.18 from the life insurance policy on Dr.
Castellano's life.  That letter and check were addressed to
Jeanne Bonney – counsel to Penn-Mont and an employee at
Koresko's law firm – "as Trustee."  Castellano Stmt. ¶ 13;
Koresko Stmt. Resp. ¶ 13; CX16.

On July 15, 2003, a sum of $751,266.18 (the same
amount that the REAL VEBA Trust received from Dr. Castellano's
insurance policy) was deposited into a high performance money
market account at Wachovia Bank, under the name "Castellano
Death Benefit Trust."  Both John Koresko and Jeanne Bonney were

listed as Trustees.  Those moneys collected interest and were subsequently transferred to other bank accounts under the "Castellano Death Benefit Trust" account name, with Mr. Koresko and Ms. Bonney again named as Trustees.  See generally CX54.

At a temporary restraining order ("TRO") hearing in May 2011, Mr. Koresko represented to the Court that the "Castellano Death Benefit Trust" account was later closed out and that all moneys were transferred out into a central trust bank account without the "Castellano" moniker.[7]  5/27/11 TRO Hearing Tr. 21 (CX33) ("[T]he amount was placed into a central trust account with a new bank.").

On July 29, 2003 – weeks after informing Penn-Mont of Dr. Castellano's death – Mr. Morris submitted a REAL VEBA Death Benefit Form to Penn-Mont, naming Gretchen Hutto Castellano as the claimant, and attaching a beneficiary nomination form signed on January 22, 2000, which named Mrs. Castellano as the sole beneficiary.[8]  On July 30, 2003, upon receipt of the death

---

[7] The documents show that, on February 24, 2010, the "Castellano Death Benefit Trust" account at TD Bank, the last bank to have such an account designation, was closed out.  CX54 at 2.  Castellano filed the TRO shortly after receiving documents in discovery indicating that the account was closed out.  The Court denied the TRO without prejudice after receiving a letter from Koresko indicating that there were sufficient funds in the Trust to satisfy the amount of controversy in the litigation (Docket No. 218).

[8] The 2000 beneficiary nomination form was witnessed and signed by Thomas Morris.  2000 Beneficiary Nomination Form

benefit claim form, Penn-Mont forwarded a proposed Settlement

Agreement for Payment of Death Benefit to Mrs. Castellano

through Mr. Morris, as well as a Receipt, Release, Refunding,

and Indemnification Agreement.  Koresko Stmt. ¶¶ 25, 26, 28, 30;

Castellano Stmt. Resp. ¶ 25, 28, 30; Aff. of Jeanne Bonney ¶ 20

(ECF No. 35); KX8; KX9.

The proposed Settlement Agreement asked Mrs.

Castellano to choose between two forms of death benefit payment:

(1) ten years of payments of $75,000.00 per year or (2) a lump-

sum accelerated death benefit of $597,560.14.  The Receipt,

Release, Refunding, and Indemnification Agreement asked Mrs.

Castellano to release and discharge all claims, legal or

equitable, against the Trustee, Penn-Mont, and the REAL.

Proposed Settlement Agreement ¶ 3 (KX9); Indemnification

Agreement ¶ 4 (KX0).

In response to these proposed agreements, which

offered less than what Mrs. Castellano believed she was due, she

retained Holland & Knight as counsel.  Holland & Knight

subsequently contacted Penn-Mont on Mrs. Castellano's behalf and

demanded a lump-sum payment of $750,000.00.  Penn-Mont responded

---

(CX48).  On May 19, 2005, however, Mr. Morris sent a signed
statement to Penn-Mont, indicating that Dr. Castellano did not
change his beneficiary designation during his lifetime.  KX17.
On August 3, 2007, Mr. Morris executed an affidavit correcting
his 2005 statement.  He attested that he had, in fact, witnessed
Dr. Castellano execute the 2000 beneficiary nomination form.
8/3/07 Aff. of Thomas Morris ¶¶ 6-11 (CX48).

in a letter dated September 24, 2003, threatening litigation and
challenging Holland & Knight's right to represent Mrs.
Castellano.   CX51.   Holland & Knight responded with a lengthy
letter dated October 8, 2003, telling Ms. Bonney that she should
deal exclusively with Holland & Knight on the matter, and
discussing the law with response to Mrs. Castellano's claim.
Id.

          Rather than responding to Holland & Knight, however,
Ms. Bonney contacted Mrs. Castellano directly on October 13,
2003, and advised her that: (1) Penn-Mont would not recognize
Holland & Knight as Mrs. Castellano's legal representative
because the firm was not named on her death benefit claim form
and because the lawyers were not admitted to practice in the
state of Pennsylvania; and (2) no payment would be made without
Mrs. Castellano's signature on the proposed settlement and
indemnification agreements.   CX19.


     D.    Initiation of Litigation and Final Claim Determination

          On November 26, 2003, before Penn-Mont issued a formal
final denial of benefits, the REAL VEBA Trust, by and through
Penn-Mont, filed the instant declaratory judgment action against
Castellano and the Dental Practice in state court, which was
subsequently removed to this Court.   Docket No. 1; Complaint
(CX3).

On August 23, 2004, the Koresko entities moved to compel exhaustion of the administrative process and to stay proceedings pending the completion of the administrative process, even though it was the Koresko entities that had initiated the case (Docket No. 22).  The following May, Judge Green[9] granted the parties 15 days to exhaust the administrative process (Docket No. 56).

On May 20, 2005, before the time period for exhaustion had expired, Ms. Bonney again sent a letter to Mrs. Castellano, this time requesting answers to a series of questions to aid in the completion of the administrative process.  Mrs. Castellano's counsel submitted responses to the questions on her behalf in early June.  5/20/05 Ltr. from Bonney to Castellano (CX50); 6/6/05 Ltr. from Silverstein to Miller (CX52).

Finally, on June 29, 2005, Ms. Bonney issued a final claim determination on behalf of Penn-Mont, denying Mrs. Castellano's claim in its entirety.  Among the reasons for the denial were the following:

(1) the 2000 beneficiary nomination form presented by Mrs. Castellano was "questionable and possibly illegitimate";

---

[9] Over the course of this litigation, four different judges have been assigned this case: Judge Green from removal until June 2007, Judge Dalzell from June 2007 until November 2008, Judge Jones from November 2008 until May 2010, and the undersigned from May 2010.

(2) the Dental Practice terminated its participation in the
REAL VEBA, and no beneficiary is entitled to a benefit
after termination of the Plan by an employer[10];
(3) Mrs. Castellano took actions detrimental to the REAL by
filing counterclaims against the Plan, and no beneficiary
is entitled to a benefit if the beneficiary takes actions
detrimental to the REAL, the employer, or the Plan
administrator, pursuant to the "bad boy" clause[11];

(4) Mrs. Castellano "likely engaged" in a prohibited pledge
or alienation of Plan benefits by allowing her past or
present counsel to work on a contingent-fee basis and
thereby assert a charging lien on any benefit that would be
paid.[12]

---

[10] Section 3.01 of the REAL VEBA Plan Document specifies
that an employee "shall be a participant ... only during the
period the Employer is a member of the League.  Upon termination
of the Employer's League membership, whether voluntary or
involuntary, the Employee shall have no further right to the
benefits hereunder, including without limitation, those benefits
for which claims have been made but not yet paid on the date
League membership terminates."  Plan Document § 3.01 (CX7)

[11] The Plan Document's "bad boy" clause provides:
"Notwithstanding any provisions of this Plan and Trust, a
Participant who has less than ten (10) years of participation
shall forfeit any benefit payable hereunder if it is determined
by the Plan Administrator that he has engaged in a disqualifying
act with respect to the Employer, Employees, or to the League.
A Participant shall be deemed to have engaged in a disqualifying
act if he is determined by the Plan Administrator to have: ...
(2) committed any criminal act or malicious act (not rising to
the level of a crime) which damages the person or property of
the Employer, Employees or the League.  The judgment of the Plan
Administrator as to whether a Participants has committed a
disqualifying act shall be final, unless made without evidence
to support such judgment."  Plan Document § 5.10 (CX7).

[12] The Plan Document's "anti-alienation" clause provides
that "no payment to any person under any Policy, nor the right
to receive such payments, nor any interest in the Trust, shall
be subject to assignment, alienation, transfer or anticipation,
either by voluntary or involuntary act of any Participant or
Beneficiary or by operation of law."  Plan Document § 10.04
(CX7).

6/29/05 Final Claim Determination 3, 19 (CX20).


    E.    <u>The Dental Practice Settlement</u>

        On June 7, 2005, one of Dr. Castellano's sons, David
Castellano, signed a settlement agreement with REAL VEBA Trust
on behalf of the Dental Practice.  Dr. Castellano's two sons,
step-sons of Mrs. Castellano, inherited the dental practice from
their father.  The settlement agreement was filed with the Court
on July 20, 2005, and the Dental Practice was dismissed from the
suit shortly thereafter (Docket Nos. 58, 59).  That settlement
agreement stated that the Dental Practice voluntarily terminated
participation in the REAL VEBA on October 22, 2003.  Settlement
Agreement ¶¶ M, N, O (CX53).


III. <u>Analysis</u>

        This Court concluded in the related <u>Perez v. Koresko</u>
matter that, although the REAL VEBA Trust was not itself an
employee welfare benefit plan covered by ERISA, the Castellano
Plan nevertheless was, along with 532 other plans. <u>Perez</u>,
2015 WL 505471, at *8.  Nothing in the Court's review of the
record in this case disturbs that conclusion.  Indeed, the SPD
for the Castellano Plan -- which was not in the record in
<u>Perez</u> but is in the record here -- explicitly states that the

Plan is "covered by the Employee Retirement Income Security Act
of 1974 ('ERISA')."  SPD § 13 (CX6).

At oral argument, the parties both acknowledged the
applicability of ERISA and that the effective claims in the case
come down to whether Castellano has a 29 U.S.C. § 1132(a)(1)(B)
claim to recover benefits due under the terms of the Plan, or,
in the alternative, for equitable relief under 29 U.S.C.
§ 1132(a)(3) and Cigna v. Amara, 131 S. Ct. 1866 (2011).
See 10/22/12 Oral Argument Tr. 5-7.


A.   ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

When making discretionary decisions regarding
eligibility for plan benefits, a plan administrator engages in a
fiduciary act and must therefore be treated as a plan fiduciary.
Varity Corp. v. Howe, 516 U.S. 489, 511 (1996).  A fiduciary is
obliged to act "in accordance with the documents and instruments
governing the plan insofar as such documents and instruments are
consistent with the provisions of [Title I] and [Title IV] of
ERISA."  29 U.S.C. § 1104(a)(1)(D); Kennedy v. Plan Adm'r for
DuPont Sav. & Inv. Plan, 555 U.S. 285, 300 (2009).

ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B),
provides potential relief to beneficiaries when a plan
administrator does not act consistently with plan documents.
That provision allows a civil action by a participant or

16

beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

           1.   <u>Standard of Review</u>

     Although ERISA on its own does not specify a standard of review for an action brought under § 1132(a)(1)(B), the Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  In a decision involving the appropriate standard of review, the Supreme Court clarified that, where a plan gives the administrator such discretionary authority, the appropriate standard of review is abuse of discretion or an arbitrary and capricious standard. <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008); <u>Miller v. Am. Airlines, Inc.</u>, 632 F.3d 837, 845 (3d Cir. 2011) (noting that, in the ERISA context, the two standards are essentially the same).

     In this case, the REAL VEBA Plan Document (the "Plan Document") grants the administrator discretion to determine

eligibility of benefits and to construe the terms of the Plan.
The Plan Document contains many references to the
administrator's discretion.[13]   The appropriate standard of review
for the administrator's decision is therefore abuse of
discretion.   An administrator's decision is arbitrary and
capricious if it is without reasons, unsupported by substantial
evidence, or erroneous as a matter of law.   Miller, 632 F.3d 845
(citing Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d
Cir. 1993)); Doroshow v. Hartford Life & Accident Ins. Co., 574
F.3d 230, 234 (3d Cir. 2009).   A plan administrator's
interpretation of the plan will not be disturbed if reasonable.
Conkright v. Frommert, 130 S. Ct. 1640, 1651 (2010).

_____

[13] In particular, Section 5.02 of the Plan Document
specifies:

> The "Life Benefit" may be paid in a form of survivor
> income Benefit to a named Beneficiary ... . Such
> Benefit may be payable upon the death of the
> Participant in a series of monthly payments not to
> exceed 120 or as otherwise provided in an annuity
> purchased by the Plan or as agreed by the Beneficiary
> and the Administrator, in the Administrator's sole and
> absolute discretion.

Plan Document § 5.02(a) (CX7).   In addition, the Plan documents
provide that the administrator shall:

> exercise all of its discretion in a uniform,
> nondiscriminatory manner and shall have all necessary
> power to accomplish those purposes, including but not
> limited to the power: ... (b) To compute and certify
> to the Trustee the amount and kind of Benefit payable
> to Participants and their Beneficiaries.

Plan Document § 6.03 (CX7).

2.    Factors Affecting the Abuse-of-Discretion
      Analysis: Conflict of Interest and Procedural
      Irregularities

Following the Supreme Court's decision in Glenn, the existence of a conflict of interest no longer changes the standard of review from abuse of discretion to a more searching review.  Glenn, 554 U.S. at 117; see also Doroshow v. Hartford Life & Acc. Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009).  If a benefit plan, however, gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as one factor in determining whether there is an abuse of discretion.  Glenn, 554 U.S. at 117; Miller, 632 F.3d at 845; Viera, 642 F.3d at 413.

Procedural irregularities in how a benefits claim is reviewed can also be a factor in whether there is an abuse of discretion.[14]  See Glenn, 554 U.S. at 118.

---

[14] Under the pre-Glenn sliding scale approach under the Third Circuit's decision in Pinto, procedural anomalies in the review of the claimant's application for benefits was cause for heightened review.  See Kosiba v. Merck & Co., 384 F.3d 58, 66 (3d Cir. 2004) (citing Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000)).  The Supreme Court in Glenn addressed whether a conflict of interest affects the standard of review and concluded that it should be a factor in abuse of discretion analysis.  However, Glenn did not similarly address how the presence of procedural irregularities factors into the standard of review.

Post-Glenn, the Third Circuit has not explicitly addressed how, if at all, procedural irregularities affect the standard of

a.   Conflict of Interest

"The potential for a conflict of interest arises because [the same entity] both funds and administers the welfare benefits plan." Smathers v. Multi-Tool, Inc., 298 F.3d 191, 197 (3d Cir. 2002).  The record in this case leads the Court to conclude that there was a structural conflict of interest.

The REAL VEBA Trust funds the Plan in that the Trust reinsures its obligations to pay out benefits by using employer contributions to buy life insurance policies on the participating employees' lives.  The life insurance policies name the REAL VEBA trustee as the beneficiary.  Because nothing gets paid to beneficiaries until the life insurance carrier pays the REAL VEBA Trust, the funding for the death benefits comes from the life insurance policy, which REAL VEBA - not the employer - owns.  See Section 7.05(g) of the Plan Document (CX7).

The Trustee of the REAL VEBA Trust entered into a Custodial Agreement with Koresko's law firm, whereby Koresko's law firm "agrees to act as agent for the custody of certain insurance policies which Trustee owns pursuant to the REAL VEBA TRUST."  Custodial Agreement ¶ 1 (CX40).  That agreement also

review, or whether, like conflicts of interest, they are a factor in whether there is an abuse of discretion.  But extending the reasoning of Glenn, considerations previously part of the sliding scale approach should be factors in whether there has been an abuse of discretion.

20

granted the Koresko law firm control over "surrender of, change of beneficiary of, application of premium payment to, change of ownership of, withdraw of cash value from, and/or borrowing from any Insurance Policy." Id. ¶ 12.

Penn-Mont administers the Plan and, like the Trust, is a Koresko-controlled entity. The record shows that Penn-Mont has no employees, is majority-owned by John Koresko, and John Koresko's law firm performs its work. Jeanne Bonney, Koresko's employee, is counsel for Penn-Mont. Finally, Koresko decides whether a claimant, like Mrs. Castellano, receives the insurance proceeds or whether Koresko keeps control of them as "surplus."

The Court, therefore, finds that there is a structural conflict of interest that factors into the analysis of whether there has been an abuse of discretion by the Plan administrator.


b.   Procedural Irregularities

Penn-Mont's decision to deny benefits to Castellano was marked by certain procedural irregularities. Written notice of the disposition of Castellano's claim was not furnished until June 29, 2005. 6/29/05 Final Claim Determination (CX 20). Prior to that, the Koresko entities had sent letters with offers of settlement and then filed a declaratory judgment lawsuit against Castellano when those offers were not accepted. This disposition of the claims after the initiation of litigation and

21

a court-ordered expedited administrative process was irregular
and inconsistent with the terms of the Plan documents.[15]   The
Court, therefore, will consider the procedural irregularities as
a factor in evaluating whether Penn-Mont's denial of benefits
was an abuse of discretion.

       3.   Whether Penn-Mont's Denial of Benefits was an
          Abuse of Discretion

     The Court must decide whether the decision to deny
Mrs. Castellano benefits was an abuse of discretion.[16]   In its
final claim determination, the plaintiff offered four reasons
for the denial of benefits.   See 6/29/05 Final Claim
Determination (CX 20), at 3.   The Court finds each of these
justifications invalid on the record before the Court.

---

[15] See 5.06(d) of the Plan Document (CX 7)("Written notice
of the disposition of the claim [for benefits] shall be
furnished [to] the claimant within thirty (30) days after the
application thereof is filed.   In the event the claim is denied,
the reasons for the denial shall be specifically set forth,
pertinent provisions of the Plan shall be cited and, where
appropriate, an explanation as to how the claimant can perfect
the claim will be provided.").

[16] At oral argument, counsel for Castellano clarified that
the action taken by Penn-Mont for which court review is sought
is the June 29, 2005, denial of benefits, not the prior
settlement letters that offered less than the $750,000 lump sum.
See Oral Arg. Tr. 40, Oct. 22, 2012.

The first, third and fourth reasons are very weak and appear to be make weight.  The Court will discuss them before discussing the second reason for the denial.

The first reason was that the 2000 beneficiary form presented by Mrs. Castellano was "questionable and possibly illegitimate."  But there is nothing in the summary judgment record to justify the plaintiff's suspicions of forgery or mistaken identity.[17]  There was inconsistency in Thomas Morris' statement but there was no evidence that Mrs. Castellano forged any documents.  See, supra, n.8.

The third reason for denial of benefits was that Mrs. Castellano violated the "bad boy" clause when she "filed

---

[17] Following are some of the baseless findings of fact the plaintiff made in connection with this reason for denial:

The administrator finds that the signature on the 2000 form "does not match on the life insurance application or the [1998 beneficiary form]."  CX 20 at 16 ¶ 81.  A layman's handwriting opinion should not be the basis for a denial of benefits.

The administrator finds that there is no official document that identifies anyone as Gretchen Castellano, and that there is no evidence Gretchen Hutto (Mrs. Castellano's maiden name) ever changed her name to Castellano.  Id. at 14 ¶¶ 66-67.

The notary public verified Castellano's identity from personal knowledge, Castellano's marriage certificate, and driver's license.  The administrator finds that the marriage certificate does not identify anyone as "Gretchen Hutto Castellano" (because Castellano's maiden name is used), that the marriage certificate states there is a 25 year age difference between Dr. Castellano and his wife, and that no proof of prior divorce of either party as provided.  Id. at 15 ¶¶ 71-75.

litigation against the Plan and Plan administrators."  This reason makes no sense in view of the fact that the Koresko-controlled entities initiated the litigation.  Mrs. Castellano was entitled to defend herself and file counterclaims.

The fourth reason given for denial of benefits was that Mrs. Castellano "likely engaged" in a prohibited pledge of alienation of Plan benefits by allowing her past or present counsel to work on a contingent fee basis.  This appears to be a forced reading of the anti-alienation clause. and an afterthought.

The plaintiff's second reason for denial of benefits was that the Dental Practice terminated its participation in the REAL VEBA on October 22, 2003.  See Settlement Agreement ¶¶ M, N, O (CX 53).

Section 3.01 of the Plan Document states:

[An employee] shall be a participant . . . only during the
period the Employer is a member of the League.  Upon
termination of the Employer's League membership, whether
voluntary or involuntary, the Employee shall have no
further right to the benefits hereunder, including without
limitation, those benefits for which claims have been made
but not yet paid on the date League membership terminates.

Plan Document § 3.01 (CX 7).  This portion of the Plan Document, the plaintiff argues, means that because the Dental Practice terminated League membership, Dr. Castellano no longer had the

right to have his named beneficiaries receive benefits because he was no longer a participant.

The difficulty in adopting the plaintiff's argument, however, is that § 9.02 confounds the plain meaning of § 3.01.

Section 9.02 reads in pertinent part:

(a) Upon dissolution of the Plan and/or termination of the Employees' association from the League by virtue of an Employer's voluntary or involuntary termination of membership in the League, any assets remaining in the Plan after satisfaction of all liabilities to existing Beneficiaries shall be applied in one or a combination of the following, as selected by the Trustee or Plan Administrator in its discretion.
      [. . . .]
(b) In the event an Employer terminates it [sic] membership in the League, either voluntarily or involuntarily, any distribution to Employees of such Employer pursuant to section 9.02(a) shall be made only from the aggregate assets of the Trust constituting the Participant Account(s) attributable to such Employer's Employees.  Without limiting the generality of the foregoing, distributions to a particular Participant may be based upon a formula. . . .

Plan Document § 9.02 (CX 7).

The language regarding "satisfaction of all liabilities to existing Beneficiaries" and "distribution to Employees of such Employer" raises the question as to why – if § 3.01 is interpreted as written – there would be liabilities to existing beneficiaries or distributions to employees if the employer has terminated membership in the League.  If benefits terminate with employer membership in the League, as § 3.01 seems to provide, then § 9.02 is superfluous as it refers to distributing benefits that would not exist.

25

At oral argument, counsel for the plaintiff argued that § 9.02 is not inconsistent with § 3.01 because it refers to the termination of the REAL VEBA Plan as a whole, not termination of league membership at the individual employer level.  See Oral Arg. Tr. 30-31, Oct. 22, 2012.

The difficulty with that interpretation is that the use of the and/or conjunction in § 9.02(a) means that the section applies in the event that the employee's association with the Plan is severed because of the employer's voluntary or involuntary termination of membership in the league, even without the total dissolution of the Plan.

Extrinsic evidence is also in conflict.  The SPD states at one point:

> Expulsion from the VEBA - IMPORTANT NOTICE
> Under the terms of the Plan, you are only entitled to benefits so long as your Employer is a member of the League which sponsors this Plan.  League membership can be terminated voluntarily or involuntarily.  NO BENEFITS WILL BE PAID FOLLOWING TERMINATION OF LEAGUE MEMBERSHIP.
>
> The League reserves the right to involuntarily expel your Employer from League membership.  This could happen if your Employer made false statements in its documents connected with adopting this Plan.  It could also happen if your Employer fails to fulfill its financial responsibilities to the Plan and Trustee.  There are other reasons why expulsion could occur.
>
> If your Employer is not in compliance with the League's rule regarding contributions to the Plan, claims for benefits are not obligations of this Plan until after 30 days after they are presented.  If your employer is expelled or terminates League membership during that time,

26

the benefit will not be paid, even if a claim has been
presented.

SPD § 11 (CX 6).

In the above-quoted portion of the SPD, the first
paragraph has a categorical statement that no benefits will be
paid following termination of league membership.  That statement
seems belied by the third paragraph, however, which describes
the termination of league membership as having the effect of
cutting off benefits when that termination occurs within thirty
days of a benefit claim.  The Court notes that the termination
of league membership in this case occurred more than thirty days
after the claim for benefits.

Moreover, there is additional extrinsic evidence in
favor of Castellano's position as language from a part of the
Penn-Mont website called a Benefits Case Study says,
"[E]mployers should enter into these arrangements with the
intention of providing valuable benefits.  If termination does
occur, all assets are allocated to those employees who where
[sic] actively participating on the date of termination.
Distribution is made pro rata, in proportion to each employee's
cumulative compensation during years of participation in the
plan."  CX31.

The conflict between § 3.01 and § 9.02 of the Plan
Documents renders the Plan Documents ambiguous with respect to

27

the impact of termination of league membership on a claim for benefits, and the extrinsic evidence only adds to that ambiguity.

In this case, on the particular facts of this record, the Court finds that to deny benefits was an abuse of discretion.  Three of the four specific reasons given for the denial appear to be make weight.  None of them either individually or together would be an adequate basis to deny benefits under these circumstances.  The fourth reason, termination of the plan by one of Mrs. Castellano's stepsons, does present a more serious issue.  But under these circumstances, the Court finds that it was an abuse of discretion to rely on the termination.

Mrs. Castellano made her application for benefits almost three months before the termination of the Plan.  The Plan was terminated by her stepson, who was antagonistic toward his stepmother, shortly before the filing of the lawsuit.  Oral Arg. Tr. 38:21-39:6, Oct. 22, 2012; Koresko Stmt. ¶ 46; Castellano Stmt. Resp. ¶ 46; Settlement Agreement ¶¶ M, N, O. (CX53).  The insurance company had already paid $751,266.18 to the REAL VEBA Trust.  The language of the documents is ambiguous and should be construed against the drafter, especially in this

case where there was a conflict of interest and procedural irregularities in the decision making.[18]

The Court is especially concerned about the procedural irregularities.  The death benefit forms were sent on July 29, 2003, and a proposed settlement agreement was sent on July 30, 2003.  Mrs. Castellano then retained Holland & Knight who attempted to represent her in discussions with Penn-Mont.  Penn-Mont responded with a letter dated September 24, 2003, threatening litigation and challenging Holland & Knight's right to represent Mrs. Castellano because they were not Pennsylvania lawyers.  Holland & Knight responded in a letter dated October 8, 2003, in which Holland & Knight told Ms. Bonney to deal exclusively with them and setting out legal arguments as to why Penn-Mont was wrong about their right to represent Mrs. Castellano and about Mrs. Castellano's right to receive the face value of the policy.  Rather than continuing the discussion with Holland & Knight or going forward with the administrative process then, Koresko filed a lawsuit against Mrs. Castellano on November 26, 2003.  Meanwhile, one of Mrs. Castellano's step-

---

[18] Cf. Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 (3d Cir. 1993), ("Adoption of *contra proferentem* as a federal common law rule in ERISA insurance cases makes sense because to do otherwise would require us to ... afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted, a result that would be at odds with the congressional purposes of promoting the interests of employees and beneficiaries and protecting contractually defined benefits.") (internal quotations omitted).

sons, who had inherited the dental plan and was antagonistic toward Mrs. Castellano, terminated the Plan on October 22, 2003. Had there been a willingness to engage in discussion with Holland & Knight, the dispute may have been resolved before the termination.  The Court limits its decision to the facts of this case.

The Court, therefore, rules that the Trust must pay $750,000.00 to Mrs. Castellano.  The Court is not ordering that Koresko or the Koresko entities pay the benefits to Mrs. Castellano because in the <u>Perez</u> case, discussed above, the Court ordered them to pay restitution for losses and disgorgement of profits to the Trusts in an amount over $19 million.

The Court does not need to decide whether it was improper under the trust documents for the trust, in the first instance, to refuse to pay Castellano the full amount of the policy but instead to offer a lesser amount up front or the $750,000.00 over ten years because this case has now been pending for twelve years, and Mrs. Castellano has received no benefits over those years.

The Court considered referring this matter to the Administrator or Trustee whom the Court has appointed but concluded that referral would not be fair to Mrs. Castellano

30

because this case has been pending for so many years.[19]  If the

Trustee were to deny the claim or any part of it, the decision

would be back before this Court.  Under these particular

---

[19] The plaintiff argues, based on the holding in Conkright
v. Frommert, 559 U.S. 506 (2010), that if the Court concludes
that there was an abuse of discretion, the Court should refer
the matter back to the administrator to determine what benefits,
if any, Castellano is entitled to.  In Conkright, the Supreme
Court held that lower courts erred when they did not apply a
deferential standard of review to a plan administrator's
interpretation of plan provisions, even after the plan
administrator's previous interpretation had been invalidated
under a deferential standard of review.  Id. at 512-522.
Conkright does not compel the Court to refer this matter to the
administrator.  Conkright holds that courts should apply a
deferential standard of review to the interpretations of a plan
administrator, not that courts must give plan administrators an
opportunity to offer such an interpretation.  Id.

One important concern motivating the Supreme Court's
decision in Conkright is not present in this case:  the interest
in predictability and consistent interpretations of plan
provisions.  Id. at 517-18.  The Conkright Court was concerned
with avoiding "a patchwork of different interpretations of a
plan . . . that covers employee in different jurisdictions."
Id. at 517.  The Court's interpretation of the Plan in this case
will not give rise to conflicting interpretations among
different employees due to the unique factual circumstances that
form the basis of the Court's decision.  The Court's
interpretation of the termination clause, for example, is based
partly on the circumstances in which the clause was exercised in
this case.  Those facts are unlikely to be repeated in future
claims.

The statutory language on which Castellano's claims are
based also shows that the Court is not required to refer
Castellano's claims to the administrator.  Section 1132(a)(1)(B)
states that a civil action may be brought by a beneficiary "to
recover benefits due to [her] under the terms of the plan."
29 . U.S.C. § 1132 (a)(1)(B). ERISA, therefore, expressly
provides that an award of benefits due a beneficiary is a proper
remedy in a section 1132 (a)(1)(B) action.

circumstances, the Court does not think it would be fair or equitable to delay payment any longer.

    B.   <u>Other Claims</u>

       On August 29, 2011, Castellano filed a Motion to Amend that sought to add a count for equitable relief under ERISA Section 502(a)(3), citing the Supreme Court case <u>Cigna v. Amara</u>, 131 S. Ct. 1866 (2011).  The Court will grant the motion to add the claim but will not decide that claim in light of the Court's conclusion that Castellano is entitled to benefits under the Plan documents.

       Castellano's counterclaim brought state law claims for breach of contract, common law breach of fiduciary duty, and conversion.  These claims were alleged as an alternative theory to recovery under ERISA and are preempted by the Court's finding that the Castellano Plan is governed by ERISA.

       The counterclaim complaint also brought a count under 29 U.S.C. § 1132(a)(2), but such an action for breach of fiduciary duty is a derivative suit on behalf of the Plan.  The remedy for such breach is for a fiduciary to make good on losses or restore profits to the Plan, not to the beneficiary. <u>See</u>  29  U.S.C. § 1109.

       The counterclaim also brought a count under 29 U.S.C. § 1132(a)(2), alleging a failure to provide a requested copy of

the life insurance policy for Castellano's husband.  That count has not been argued so the Court denies summary judgment to Castellano on that claim.

Finally, Castellano brought a civil RICO count, alleging a conspiracy among various Koresko-controlled entities. One of the elements of a RICO claim is that the defendants engaged in a pattern of racketeering activity.  18 U.S.C. § 1962(c).  To establish a pattern of racketeering activity, a plaintiff must establish that the defendant committed at least two acts of prohibited racketeering activity, and that those predicate acts are both related and amount to or pose a threat of continued criminal activity. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 2900, 106 L. Ed. 2d 195 (1989).

Here, Castellano alleges that the Koresko parties committed predicate acts in the form of conversion and mail and wire fraud.  The Court finds that the record does not establish the Koresko parties engaged in the requisite predicate acts in this particular matter.

IV.  Conclusion

For the foregoing reasons, the Court will deny the plaintiff's motion for summary judgment on its declaratory judgment action regarding the claim that the REAL VEBA may

refuse to pay any benefit to Castellano.  The Court will grant
Castellano's motion for summary judgment for relief under
Section 502(a)(1)(B) of ERISA and award Castellano benefits
under the Plan Documents.

> The Court will deny Castellano's motion for summary
judgment on its equitable ERISA claim, the common law
counterclaims, and the civil RICO claims.

> An appropriate order follows.